MONIQUE C. WINKLER (Cal. Bar No. 213031)
MARC D. KATZ (Cal. Bar No. 189534)
  katzma@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
  zhoud@sec.gov
ERIN E. WILK (Cal. Bar No. 310214)
  wilke@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| MANISH LACHWANI, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

## SUMMARY OF THE ACTION

1.      From at least 2018 through 2020, Manish Lachwani engaged in a fraudulent scheme to propel the valuation of his Silicon Valley technology start-up, HeadSpin, Inc., to over $1 billion by falsely inflating the company's key financial metrics and doctoring its internal sales records. Lachwani then used HeadSpin's inflated valuation and financial numbers to deceive investors into pouring approximately $80 million into the company between 2018 and 2020, and to enrich himself through the offer and sale of approximately $2.5 million of his personal HeadSpin stock.

2. HeadSpin made virtually all of its revenue by charging customers fees to use its hardware and software products. To create the illusion of strong and consistent growth, Lachwani, who controlled all important aspects of HeadSpin's financials and sales operations, falsely inflated the values of numerous customer deals that, in reality, were much smaller. He also fraudulently treated uncommitted deal amounts that he had discussed with customers as if they were guaranteed future payments. He concealed this inflation by creating fake invoices and altering real invoices to make it appear as though customers had been billed higher amounts.

3. Lachwani's fraudulent actions increased HeadSpin's revenue-related financial measures, which, in turn, fueled the company's valuation upward. In fall of 2018, ahead of its Series B fundraising round, HeadSpin was valued at approximately half a billion dollars. When Lachwani sold his personal stock in around May 2019, that valuation had climbed about 50 percent to approximately $750 million. Less than six months later, in fall of 2019, HeadSpin's valuation for its Series C fund raise had jumped to approximately $1.1 billion and entered so-called "unicorn" status.

4. Lachwani knowingly or recklessly provided these lies about HeadSpin's valuation and its seeming financial success to prospective investors. He made numerous false statements that were designed to convince investors that HeadSpin had hundreds of customers, including many of Silicon Valley's biggest and most high-profile companies, signed up to long-term contracts totaling tens of millions of dollars per year. Investors invested millions of dollars in HeadSpin based on Lachwani's misrepresentations.

5. Lachwani's fraud unraveled in spring of 2020, following an internal investigation. Lachwani was forced to resign as CEO, and HeadSpin revised its valuation dramatically downward from the $1.1 billion claimed during the Series C round to approximately $300 million.

6. By his actions, Lachwani violated the antifraud provisions of the federal securities laws. Specifically, Lachwani violated 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. The SEC requests, among other things, that the Court: (i) permanently enjoin Lachwani from further violating the federal securities laws as alleged in this complaint; (ii)

permanently enjoin Lachwani from participating in the issuance, purchase, offer, or sale of any security; (iii) prohibit Lachwani from acting as an officer or director of a publicly traded company; and (iv) order Lachwani to pay civil monetary penalties.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. Lachwani, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

11. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Lachwani met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

12. Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Santa Clara County, where HeadSpin's principal place of business is located.

## DEFENDANT

13. **Manish Lachwani**, age 45, resides in Los Altos, California. He served as HeadSpin's Chief Executive Officer until he stepped down in around May 2020. Lachwani controlled HeadSpin's business functions and operations from its formation in about 2015 through his tenure as CEO. Lachwani sold a portion of his own HeadSpin stock during an offering in around May 2019. During the Commission's investigation, Lachwani declined to produce any documents concerning the investigation on the basis of his Fifth Amendment privilege against self-incrimination.

## RELATED ENTITY

14.     **HeadSpin, Inc.** is a Delaware corporation with its principal place of business in Palo Alto, California.  HeadSpin provides customers with hardware and software tools to test their mobile software applications across the world.  In 2020, after Lachwani's fraud was uncovered, HeadSpin reduced its valuation by more than $800 million and returned approximately 70% of principal to investors in the Series B and C funding rounds.  However, some investors retained their shares in HeadSpin, and the company remains operational.

## FACTUAL ALLEGATIONS

### I.     HeadSpin Sells Customers Tools for Testing Mobile Apps.

15.     Lachwani co-founded HeadSpin in 2015 to provide hardware and software tools that allow customers to test their mobile software applications, or "apps," and ensure that their apps work on different operating systems as well as various internet and cellular data networks.  Prior to HeadSpin, Lachwani co-founded another start-up technology company that was sold to a major Silicon Valley company in 2014, and he also served as Chief Technology Officer for a prominent public company in the mobile gaming industry, among other roles.

16.     HeadSpin provided its customers access to mobile devices located all over the world.  Customers were then able to use HeadSpin's proprietary software to test their apps on these devices across different networks.  Typically, HeadSpin charged a one-time set-up fee as well as recurring fees for use of the devices and software.

17.     HeadSpin sold its products and services in two ways.  First, HeadSpin entered into direct agreements with corporate customers.  Second, HeadSpin worked with third-party resellers, who acted as middlemen to market and sell HeadSpin's products and services to corporate customers.

18.     In some cases, customers, such as the third-party resellers, signed non-binding agreements with HeadSpin that set forth the products and services they planned to purchase and sometimes listed the maximum amount they would spend on those items.  However, the customer did not incur a commitment to pay HeadSpin until it submitted an order and HeadSpin, in response, charged the customer by sending an invoice.

**II.    Lachwani Engaged in a Fraudulent Scheme to Inflate HeadSpin's Financials in Order to Drive Up Its Valuation.**

19.    Beginning at least in about 2018, Lachwani engaged in a fraudulent scheme to inflate HeadSpin's financial records in order to achieve high valuations of the company that would attract investors.

20.    Lachwani understood that the amount of the valuation depended, in large part, on a key financial metric called "annual recurring revenue," or "ARR," as well as ARR growth over time. ARR is a measure of the total revenue expected per year from committed customers with signed contracts.  The metric is commonly used by software companies like HeadSpin that charge customers recurring fees to use their products.  A growing ARR shows that a company is successfully signing up new customers and/or expanding the deals it already has with existing customers.

21.    Lachwani inflated HeadSpin's ARR by falsely increasing the values of several existing customer deals of all sizes, ranging from big deals with Silicon Valley heavyweights to low dollar-value deals with smaller companies, and relying on uncommitted amounts from non-binding agreements with other customers.  He entered the fabricated amounts into the company's detailed ARR-tracking Spreadsheet that he alone controlled.  For example, in about 2018, Lachwani sent an investor a version of the ARR Spreadsheet that claimed a reseller ("Customer 1") was contributing approximately $1 million in ARR.  In reality, Customer 1 and Lachwani had signed a non-binding agreement that, among other things, set a maximum cap of $1.215 million on its purchases over two years from HeadSpin.  Importantly, Customer 1 was not obligated to pay anything until HeadSpin sent invoices at a later date.  In the end, Customer 1 only paid HeadSpin approximately $500,000 over two years—far less than the maximum cap.

22.    In other instances, Lachwani fabricated or altered invoices to provide post-hoc justifications to other HeadSpin employees for the inflated ARR amounts.  For example, from 2018 through 2020, Lachwani falsely claimed that a major San Francisco-based ride share company ("Customer 2") had agreed to pay HeadSpin about $1.44 million per year.  In truth, Customer 2 made a single purchase worth $720,000 in 2018, and did not make a long-term commitment.  To bridge the gap between reality and his false claims, Lachwani concocted a fake invoice covering the remaining

amount (*i.e.*, $720,000) in 2018, and in 2019 he created two more fake invoices to represent a supposed renewal of the full $1.44 million.

23.     In addition, Lachwani falsely inflated HeadSpin's actual revenue numbers, which were also shared with investors, using the same methods that he used to fabricate ARR.  Lachwani dictated the inflated revenue numbers each quarter to HeadSpin's bookkeeper, who recorded those numbers in the company's financial statements.  He frequently sent the numbers without supporting documentation (like contracts and invoices) notwithstanding the bookkeeper's regular requests for such backup, and he sometimes sent her fake or altered invoices that he had created, including the three fictional invoices related to Customer 2 and a doctored invoice related to Customer 1.

24.     On the strength of its fraudulently inflated ARR and other financial numbers, HeadSpin achieved impressive valuations leading into its three fundraising rounds.  In advance of the Series B round in fall of 2018, HeadSpin was valued at approximately $500 million.  When Lachwani sold his personal HeadSpin stock in around May 2019, HeadSpin had increased its valuation to approximately $750 million.  Just six months later, at the start of its Series C round, HeadSpin had again surged in valuation to approximately $1.1 billion.  Lachwani falsely inflated the metrics, including ARR, in order to lure HeadSpin investors into paying increasingly higher prices for HeadSpin's shares.

25.     Lachwani was able to carry out his fraudulent scheme for years because he controlled and managed all the key aspects of HeadSpin's financials and sales operations, and he kept HeadSpin employees in those different departments isolated from each other.  For instance, virtually all the information provided to HeadSpin's bookkeeper, including the supporting documentation for claimed revenue amounts, flowed through Lachwani.

26.     By virtue of his control over the company, Lachwani knew, or was reckless in not knowing, that HeadSpin's ARR and other financial numbers were false and inflated.  He had sole ownership of the ARR Spreadsheet and used it to personally calculate the company's quarterly and yearly ARR.  As Lachwani admitted in a December 2017 email, he intended to "super micro manage[]" the company's financials and finance function, and he rebuffed repeated requests from late 2017 into 2020 from HeadSpin's board to hire a CFO to manage HeadSpin's day-to-day finances.  At

the same time, he knew, or was reckless in not knowing, about HeadSpin's relationships with customers because he personally interacted and negotiated with many of them, and he directly supervised the small staff of sales people who managed customer deals.

**III.    Lachwani Lied to Series B Investors About HeadSpin's Financials and Customers.**

27.    From August 2018 through October 2018, Lachwani made numerous false and misleading representations about HeadSpin's ARR, financials, and customer growth in connection with the offer and sale of HeadSpin's preferred stock in the Series B round.  In promoting the Series B offering, Lachwani knowingly or recklessly provided investors with the false impression that HeadSpin was experiencing substantial growth in both its expected revenues and its number of customers.  He personally met and communicated those misrepresentations to prospective investors through emails, telephone calls, and in-person due diligence meetings.  Lachwani also directed his employees to include false information in written investor materials provided to investors, including pitch decks, financial spreadsheets, and other promotional materials.  The Series B offering succeeded in raising approximately $20 million from about 26 investors.

28.    Lachwani repeatedly knowingly or recklessly misrepresented HeadSpin's ARR and ARR growth to Series B investors by sending them ARR numbers that he had falsely inflated.  He sent emails to investors in which he touted the inflated overall ARR for the company as well as the grossly overstated ARRs for certain high-profile customers.  Lachwani also provided a 2018 Pitch Deck to Series B investors that, among other things, listed falsely inflated "revenue commitment" amounts and growth percentages for specific big-name customers, including Customer 1 and Customer 2.  In addition, Lachwani provided certain large investors with versions of the detailed ARR Spreadsheet, which also contained inflated ARR numbers for Customer 1, Customer 2, and others.

29.    Lachwani sent those false ARR numbers even though he knew, or was reckless in not knowing, that HeadSpin's ARR would be a focus of prospective investors, who would use it to evaluate the extent to which the company's products were gaining traction with customers.  Lachwani also knew, or was reckless in not knowing, that ARR, which is a widely used metric in the software-subscription industry, was supposed to be calculated based on signed contracts with committed

customers. In fact, he told investors that HeadSpin's ARR reflected signed customer agreements with customers who had already been sent HeadSpin's products and were able to use them. Those representations were false and misleading.

30. Lachwani made additional misrepresentations to Series B investors beyond the ARR numbers. Lachwani knowingly or recklessly sent financial statements to investors that contained false and inflated revenues. He also promoted the inflated valuation. For instance, in an August 2018 email to an investor, Lachwani touted that the company was "raising $10m @ $500m valuation."

31. Relatedly, Lachwani also knew, or was reckless in not knowing, that Series B investors would be impressed by HeadSpin's purported roster of customers, which included some of the largest and most recognizable technology companies in the world. But Lachwani knowingly or recklessly included numerous companies on the list even though those companies had terminated their relationships with HeadSpin or had declined to make a purchase after trying HeadSpin's products. For example, the 2018 Pitch Deck that Lachwani shared with Series B investors falsely asserted that HeadSpin had experienced "No Customer Loss and Triple Digit Growth." In reality, HeadSpin had lost customers that decided to stop using HeadSpin's services. The 2018 Pitch Deck also included logos for at least 50 major companies, a number of which were not active HeadSpin customers. For instance, the deck included the logo of a highly successful Silicon Valley-based computer and cellphone manufacturer ("Customer 3") even though Customer 3's sole purchase expired more than a year earlier and was not renewed.

**IV.    Lachwani Made More False Statements When He Sold $2.5 Million of His Own Stock.**

32. A few months after the close of the Series B round, in around May 2019, Lachwani conducted a secondary offering in which he sold approximately $2.5 million of his personal HeadSpin stock to one of the company's existing investors ("Investor 1"). Lachwani had already made numerous misrepresentations to Investor 1 in connection with the Series B funding round. He made additional false and misleading statements to Investor 1 before it purchased his stock.

33. In particular, Investor 1 noticed in around May 2019 that HeadSpin's financial statements included tens of millions of dollars of "unbilled revenue," meaning that HeadSpin had not

yet sent its customers invoices to charge them. Investor 1 asked Lachwani to explain why HeadSpin was not billing its customers. In response, Lachwani told Investor 1 that HeadSpin often allowed customers to use the product several months before submitting a bill. But Lachwani knowingly or recklessly omitted that he had falsely inflated the revenue commitments of many HeadSpin customers and dumped the inflated revenue into the "unbilled revenue" category.

34.    In an effort to reduce the total "unbilled" amount and avoid additional questions from investors, Lachwani again doctored invoices. In around June 2019, Lachwani took several real invoices that had been sent to a reseller ("Customer 4") and altered them to increase the billed amounts by hundreds of thousands of dollars. Then, Lachwani emailed these altered invoices to HeadSpin's bookkeeper, who reduced the "unbilled" amount accordingly.

## V.    Lachwani's Misrepresentations Catapulted HeadSpin to a $1.1 Billion Valuation During the Series C Funding Round.

35.    Less than a year after its successful Series B fund raise, HeadSpin conducted a Series C fundraising round between August 2019 and February 2020 to offer and sell an additional $60 million of its preferred stock. Lachwani's scheme to fraudulently inflate HeadSpin's ARR and other financials had continued throughout 2019, and by the start of the Series C round, Lachwani knowingly or recklessly told investors that HeadSpin would reach approximately $80 million of ARR by year end. The company's impressive (but false) financials fueled a valuation of approximately $1.1 billion, a milestone that earned the startup "unicorn" status – a status touted by Lachwani and noticed by investors. Ultimately, 29 investors purchased HeadSpin stock at prices based on that inflated valuation.

36.    As with the Series B round, Lachwani knowingly or recklessly made numerous misrepresentations to Series C investors about ARR, revenue, and customer growth. He continued to knowingly or recklessly claim falsely inflated ARRs for many customers, including Customer 1 and Customer 2, in an updated version of the ARR Spreadsheet that he sent to Series C investors. In fact, he increased the claimed ARRs for certain existing customers. For example, according to the 2019 ARR Spreadsheet, a reseller, Customer 4, had ARR of over $10 million. However, HeadSpin only received approximately $1.4 million total in payments from Customer 4 between 2018 and 2019. He

also added inflated ARRs for new customers, including, for instance, a major credit card company that signed a non-binding agreement with HeadSpin in 2019. Separately, the financial statements that Lachwani provided to Series C investors contained similarly inflated revenue numbers.

37.     Lachwani also continued to knowingly or recklessly make misrepresentations about HeadSpin's retention of customers. In around September 2019, he sent a prospective investor a version of the 2019 ARR Spreadsheet and knowingly or recklessly misrepresented that HeadSpin had only lost two customers and that "[e]very other deal has expanded or stayed the same." He made those claims even though he knew, or was reckless in not knowing, that many listed customers – including Customer 1, Customer 2, and Customer 4 – had paid HeadSpin far less than the amounts claimed in the ARR Spreadsheet. As another example, Lachwani reviewed a draft investment memorandum put together by Investor 1 in anticipation of the Series C round. He knowingly or recklessly confirmed the accuracy of the memorandum even though it incorrectly identified Customer 3, which had ended its relationship with HeadSpin in 2017, as part of the company's "impressive customer base."

38.     The grossly overstated ARR, revenues, and customer lists were important to investors who participated in HeadSpin's three offerings between 2018 and 2020 because those metrics were directly related to the future growth and success of HeadSpin's business and, thus, the likelihood that investors would obtain a return on their investments in the company.

**VI.     Lachwani's Fraud Unraveled When His ARR Inflation Came to Light.**

39.     In March 2020, the company's Board of Directors was alerted to concerns about the accuracy of the financial and customer information provided to investors and discovered, through an investigation, significant issues with HeadSpin's reporting of customer deals. HeadSpin then determined, based on a subsequent review of its financial information, that HeadSpin's ARR at the end of 2019 was closer to $10 million, as opposed to the $80 million represented to investors.

40.     In May 2020, HeadSpin forced Lachwani to resign, and Lachwani also returned approximately $2 million to Investor 1, which had purchased some of his personal HeadSpin stock in May 2019.

41.     HeadSpin revised its valuation from approximately $1.1 billion down to approximately $300 million.  The company also returned approximately 70% of principal to investors in the Series B and C funding rounds.  The company further offered to return the remaining funds in the form of promissory notes with one percent interest.  Approximately 31 investors chose to retain their HeadSpin stock instead of exchanging for promissory notes.

**FIRST CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

42.     The Commission re-alleges and incorporates by reference paragraphs 1 through 41.

43.     Defendant, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

> a.   Employed devices, schemes, or artifices to defraud;
>
> b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
>
> c.   Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

44.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**(Violations of Section 17(a) of the Securities Act)**

45.     The Commission re-alleges and incorporates by reference paragraphs 1 through 41.

46.     Defendant, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails,

> a.   with scienter, employed devices, schemes, or artifices to defraud;

b.  obtained money or property by means of untrue statements of material fact or

            by omitting to state a material fact necessary in order to make the statements

            made, in light of the circumstances under which they were made, not

            misleading; and

        c.  engaged in transactions, practices, or courses of business which operated or

            would operate as a fraud or deceit upon purchasers.

47.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined
will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

        WHEREFORE, the Commission respectfully requests that the Court:

                                            I.

        Enter an order permanently enjoining Defendant from directly or indirectly violating Section
10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder,
and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

                                            II.

        Enter an order permanently enjoining Defendant from directly or indirectly, including, but not
limited to, through any entity owned or controlled by Defendant, participating in the issuance,
purchase, offer, or sale of any security.

                                            III.

        Enter an order requiring Defendant to pay civil penalties pursuant to Section 20(d) of the
Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

                                            IV.

        Enter an order prohibiting Defendant from serving as an officer or director of any issuer
having a class of securities registered with the Commission pursuant to Section 12 of the Exchange
Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act
[15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section
21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 25, 2021                    Respectfully submitted,


/s/ Erin E. Wilk
Erin E. Wilk
Marc D. Katz
David Zhou
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION